Good morning, Your Honors, and may it please the Court, Nico Coluto, on behalf of Appellant Mark Ricks, I reserve five minutes for rebuttal. In 2016, the hepatitis C in Ricks' body began to cause his liver to suffer irreversible damage. Despite that, DAAs, the only known cure to an otherwise incurable disease, was still withheld for an additional two and a half years. At a very minimum, Your Honor, this denial of a known cure while a critical bodily organ is known to be suffering irreversible damage that will lead to lifelong consequences establishes a plausible deliberate indifference claim that has been cleared. I have a question. Yes, Your Honor. You cite two standards or articles that your client alleges was the universal treat given. Everybody says this is the treatment. Is there anything – does an expert say, yes, that's true? Your Honor, this is – there is no expert that said that is true. But, again, this is at the pleading stage, and the articles that were – that will be established as it has in other cases. Well, let's say I read on the Internet that the universal treatment for kidney stones or whatever is X. It's in an article. I cite that article. And then do we have to accept that as true? Well, Your Honor, first of all, that is alleged. Normally, you would have to have expert testimony that says, yes, that's correct. Well, at the pleading stage, Your Honor, I think you do accept that it's true. And as the court – if the court were to look at cases that have been decided in other circuits where expert testimony has come out, there really is no dispute that the medical relevant authorities do say that anyone with hepatitis C should be treated with DEAs. That truly is the universal standard of care. And that really is a fact, and I would be surprised if the defendants here dispute that. In any case, no matter what the circumstances, you treat – you use this treatment. It's – patient specifics have nothing to do with the equation. If they have X level of blood or whatever some measure is, the universal treatment is X. It doesn't vary from patient to patient. The only reason to not be given would be short life expectancy. That's the only thing that the guidelines state. But, Your Honors, I want to clarify, Ricks is not just any person suffering from hepatitis C. He is at the very severe stages of cirrhosis. His liver is suffering irreversible damage on a daily basis. My question and difficulty is with accepting that you don't need for a clearly established law a case about hepatitis C and DEA, accepting that that argument of yours is right. At the broad level of any chronic degenerative disease that will be fatal – so I'm thinking chronic leukemia, any number of diseases where it is valid and most patients do go through a long watch and wait until a doctor molecularly or whatever says, oh, my goodness, it's metastasized. Where's the clearly established law that prison staff, even a physician's assistant, who knows that the prisoner is under constant medical care, scans, ultrasounds, appointments, that person has a duty to sort of recommend a more advanced novel treatment when the doctors who are seeing him all the time don't. Sure, Your Honor. To that question, I think the clearly established law is EASTER. You have to go to EASTER. But EASTER the nurse rejected to do what the doctor said. That's exactly my concern. In EASTER the nurse said, no, you're not going to get that. I think you're faking it or whatever. Here, unless I'm wrong, there's no suggestion any of the doctors that were seeing him for ultrasounds or scans or labs ever said, you've got to do DAA. You're absolutely right, Your Honor. That is correct in EASTER. But this court has applied EASTER in many cases outside of the prescription drug context. And specifically since briefing is closed, in two occasions it has applied the EASTER standard to blood clots or to someone who vomited or swallowed drugs and said EASTER – But I'm going to interrupt you there. One, I probably haven't read those if they weren't in the brief. Maybe you 28-J'd them. But those to me fit into what I'll call the acute pain situation. A person vomiting, a person just ingested something lethal. So what's your best case that Ms. Pickthall – is that how you pronounce it? Pickthall, yes. Pickthall was on fair notice that she said, in my mind, sort of usurp the role of his doctors and say, you've got to give him this, as opposed to saying to him, no, not yet. Your Honor, yes. I think, if I can briefly say, I think it is still EASTER. So in EASTER, the plaintiff in that case came and had a history of heart problems. The nurse knew that. He was suffering from severe chest pain. That's an indication that a critical organ was suffering. That is acute, right? That's like head slamming.  Everyone knows chest pains. It is acute, Your Honor. But here I would suggest that Ms. Pickthall was monitoring lab results that were showing that the liver was suffering irreversibly. That damage cannot be undone. Lab results in cirrhosis, these are scars, lesions inside the body. She is the one interpreting it, and yet he's seeing a doctor. Am I right or wrong in my factual assumption that you concede he was getting labs and ultrasounds, therefore there were doctors looking at him? That's wrong, Your Honor. As far as we know, only Ms. Pickthall is the one that was really— she's the one that is ordering the lab results. She is looking at the lab results. She is the one that the medical board said. She is the one that is to prioritize Ricks for treatment. As far as the record is concerned, she is the one making these decisions. She's the presiding physician, but she's a physician assistant at the prison. She is a physician's assistant. That is correct. And on discovery, it could come out that maybe there is some unknown doctor that is the one making the medical decisions, but Ricks certainly never saw a doctor. He's only seen Ms. Pickthall, and the medical board in the grievance response states that she's the one to prioritize Ricks for treatment. I appreciate the answer. Last push on this line of inquiry. Van Wagner? Yes. They brought it up in the response, but you probably studied it closely. I did. There, if I remember our panel— now, your answer may be first, that's the summary judgment stage. That is my first answer. That's going to be your answer. But we did say without medical opinion, without a medical opinion, you wouldn't have a deliberate indifference claim, didn't we? I think that's absolutely correct, Your Honor. But, again, I'm going to repeat your point. That was at the summary judgment stage. The district court allowed it to go through the motion to dismiss stage. I absolutely agree on summary judgment at trial, Ricks will need medical opinion and experts to come forward and say what happened to him is not correct. And the defendants at that point are more than welcome to say that this was maybe a mistake. Somehow for two and a half years they looked at these lab results and didn't see that he was at this most severe level of cirrhosis. And at that point, Your Honor, it's actually worth noting that in some of the district court cases that the defendants have cited where they were granted qualified immunity, those are very much distinguishable because the damage that was being suffered there was much less than Ricks had established at this case. And Defendant Kahn in Mendez actually stated that those with severe fibrosis or cirrhosis should be prioritized for Tier 1 treatment. Well, Ricks has been in severe fibrosis since 2013, been diagnosed with cirrhosis since 2016, yet treatment was denied until 2019? That is not, that's the opposite of prioritization. And, Your Honors, the level of damage that Ricks was allowed to suffer here for two and a half years of daily liver scarring that has now caused him damage and surgeries and will for the rest of his life, the amount of damage really distinguishes this case from some of this Court's other prior unpublished cases. So in Roy, the APRI score was never above .5, very little liver scarring. And in Grumbles, there was no abnormalities in the ultrasound. Here we had those. And in Hendricks, there was never a referral to a specialist, meaning he was also likely below the .05 cutoff. So regardless of what this Court believes about monitoring at the low levels of fibrosis, the F0, F1 stages, where the cure can still be given later on and still reverse the damage that has been done, that does not establish that monitoring the damage is treatment, if treatment at all, at the very severe ends of the spectrum, of the cirrhosis spectrum, where monitoring should no longer be necessary because you are as bad as it gets. And the Eleventh Circuit has really adopted that exact approach. So in Mitchell, the plaintiff was diagnosed with cirrhosis, and the Court said that was a deliberate indifference claim, that he was being denied DAAs for nonmedical reasons when suffering cirrhosis. Then in Hoffer, the Eleventh Circuit said monitoring is okay at the F0, F1 stage, again, at the low levels of cirrhosis. But the Eleventh Circuit has adopted this approach where monitoring may be okay at the low stage but not okay at the F3, F4 stage. And so this Court could adopt a similar narrow rule. At a very minimum, prison officials cannot simply stand by and watch as a critical bodily organ is known to be suffering irreversible damage on a daily basis when a known cure is available, and that cure is actually being given to people with less severe symptoms. On those facts, Your Honor, there's no reason DAAs should have been withheld from Mr. Rich for the amount of time that they were withheld. That really should be obvious, Your Honor, but Easter, to the point where no clearly established law is needed, but Easter gives enough sufficient facts to put the defendants on notice that what they were doing violates clearly established law. As Judge Duncan just said in concurrence in Lincecum, Easter really stands for the proposition that you can't deny the only known treatment when that is the only known treatment and you have to provide that. What's our law say about factoring in cost? It's a legitimate factor, but it can't be conclusive? Is that basically it? The law, Your Honor, is, as was said by this Court in the laughter, that the decision to deny medical treatment cannot be done exclusively for non-medical reasons, including cost. Medical exclusively. It can be a factor. It absolutely can be a factor. We're not arguing it cannot be a factor. What we are arguing, Your Honor, on these facts, as alleged, there is no legitimate medical justification for the denial of treatment of Rick's for the amount of time that he was denied. There's really only two reasonable ways to interpret these facts as alleged. Both are non-medical. One is that the defendants were really simply just denying him treatment for one infliction of pain. They knew that he was suffering from hepatitis C. They saw the severe scarring. He had a bunch of defendants. So when you say they, just quickly, just in a few words, remind me who was personally involved in a denial. Pickthall, Williams, and the unknown Doe defendants that may have been there that were, you know, to the extent we've discovered those during the discussion. Williams' involvement in refusing it was? The denial of the grievances. He reviewed the grievances. She reviewed the grievances, looked at the test results, and said you're being treated in accordance with the policy. Don't worry about it. You know, just come back later. Even though he is already suffering cirrhosis, right? Irreversible scarring of the liver. You'll save a little time for the policy. I'll go right to the policy right now, Your Honor. One way I look at that is the policy is saying refer him or evaluate him. Make sure he sees doctors. So it's doctors going to run this show. Well, so the problem with the policy, Your Honor, there's really two. The 0.5 cutoff, but then after that, there's only a referral for more testing, not treatment. And so that may sound benign, but as this case shows, it really isn't. What happened, the defendants seem to be using the policy as a reason to deny treatment for even those at the most severe levels, cirrhosis, and they can do that with a straight face and say they're following the policy because the policy doesn't require actual treatment. It only requires more testing. Well, it doesn't really require testing. It requires referrals to doctors and evaluations. For more testing. And just briefly, Your Honor, that really distinguishes this policy from the other policies I've looked at in Florida and Hoffer and in the Sixth Circuit and in Atkins. The policies there mandate treatment after F2 fibrosis. And so here, this policy is very different because it doesn't require that treatment and it allows the doctors. I have a hard time. There's a disconnect to me. If it requires referral to a physician and the physician says you must treat and they don't, then they're clearly. I mean, that doesn't sound logical to me. Sure. Can you repeat the question, Your Honor? Yes. You say the policy doesn't require treatment. It only requires referral to a physician. But if the physician says you must treat and you must treat with X within X number of days and they don't do it, then they're deliberately indifferent. So I don't understand. Oh, correct. That would be correct, Your Honor. So the policy says send to a physician for treat to do. And if the physician says treat, they'll treat. It doesn't say you don't treat under any circumstances. No. But what the argument we're making is, Your Honor, the argument should say that you need to begin treatment, not just you need more testing. When you are at that point. Why shouldn't it say you send to a doctor and the doctor decides when you need treatment? Well, that is what the policy says, Your Honor. And the problem here is, again, the doctors in this case are using that policy as a sort of an excuse to deny Rick's treatment, even though on this record he is at the most severe stage of cirrhosis. There is no medical reason that he should have been denied treatment, yet even so, the doctors and Pickthall and Williams can look at the policy and say, look, we're just following the policy. And that was said many times. You're being treated in accordance with the policy, even though, because it doesn't require treatment. It only requires more testing. There should be something in the policy that actually mandates treatment. Sorry, Your Honor. The problem here is the doctors shouldn't be bound by the policy. They should be bound by their best medical judgment. So I guess there's just sort of a circular thing here. Well, yes, Your Honor. I think maybe it's helpful, again, to reinforce that under the relevant medical guidelines, there's no real medical dispute that everyone's suffering from hepatitis C. Then why wouldn't the doctors say there's no medical dispute he should get this treatment? That's what we would love to know. My point is you're saying, well, the policy should, say, refer to doctors that are independent and are not bound by a policy, and the policy doesn't govern the doctor's judgment. This is where I'm having trouble with your argument about the policy, because you're saying the policy limits what the doctors can do. I'm saying that the policy, Your Honor, should direct the doctors more clearly to say you need to give treatment. It shouldn't be this kind of haphazard just you should test him more to consider if treatment. It should be a clear directive to his doctors, look, he is suffering from cirrhosis. Is it in the record that doctors say, well, my best medical judgment is he should get this treatment immediately, but I'm bound by the policy, so I'm not going to recommend that? I'm not sure if I understand. So in this record there's no evidence at all that a doctor ever said I need treatment or that Ricks needs treatment and that it wasn't given. Here the problem is that no doctor has ever said that he needed treatment, even though he was at the very late stages of cirrhosis, at the very top of the scale. He was sent to doctors. He was sent to the ñ not doctors per se. He was referred to the chronic clinic, correct? And at the chronic clinic he saw Ms. Pickthall. That's the person he was seeing, right? And Ms. Pickthall was consistent with the policy, ordering lab results and tests, looking at those lab results and tests and still saying you don't deserve treatment, even though those tests show that he was suffering from cirrhosis, irreversible scarring of a critical bodily organ. And I'm happy to answer that more in reply, Your Honor, if I see my time is out. Thank you. May it please the Court. I'd like to start off with somewhere that my friend on the other side just left off, which was the acknowledgment that no doctor had ever ñ no doctor had ever evaluated Mr. Ricks and prescribed DAA therapy. I think with that concession we can safely put aside cases like Easter, Judge Higginson, for exactly the reasons that you noted. This is not a case of the type of thwarting that we see. But without discovery what he said is that Pickthall was the top of the medical chain. She was at the clinic. She's doing all the interpreting. We just don't know more. I don't think that's a totally accurate characterization of what Mr. Ricks himself had said about Ms. Pickthall. We could look, for example, to ñ this is discussed at around pages 26 and 27 in our brief. But there was a statement, I believe it said at page 27 of the record, where Mr. Ricks is relaying that Pickthall says she does not make the decision of whether to give me treatment. And I think, again, at page 55 and 59 of the record, he accuses Pickthall of various things, telling him he had allegedly had cancer when he didn't have cancer, but not of denying him DAA therapy. But putting that aside, I'm not here to fight against the standard of review on a 12B6 dismissal. I want to acknowledge straightforwardly that we have to take allegations in the complaint favorably as true and all of that good stuff, but it's got to raise a plausible inference of the level of wanton disregard. Well, tell me if I'm wrong if the allegations basically assert this timeline. He arrives at jail around 2011. He's getting interferon treatment, but that's not successful. During that time, his requests for DAA are denied. Pickthall then in 2015 basically says, according to the complaint, you're not sick enough to get DAA. Then by 2018, she basically says you're too sick to get it. How would that not make a plausible claim if Pickthall's at the top of the sort of food chain and she's saying you're not sick enough yet, monitor, monitor. Oh, now you're too sick. You can't get it. Or if I mischaracterized what the complaint says. Respectfully, Judge Higginson, some of the dates in your timeline are inaccurate, but they matter importantly, and we do have to acknowledge that when a plaintiff like Mr. Ricks makes these allegations, even taking them true, he's stuck with them. The key date, as you mentioned, it's not 2015. It's 2016. As my friend on the other side conceded today, we're only here talking about this narrow window in 2016 to 2019, two and a half years, when prisons all across the country are figuring out how to deploy these brand-new drug therapies with DAAs. I will point to the guidance that Mr. Ricks is relying on. Specifically to Pickthall, does he allege that she said you're not sick enough to get it around 2016, and then around 2018 she says now you're too sick to get it? So your Honor's question talks about two different sets of numbers. I don't think not sick enough, too sick is really the way to look at that. But even putting aside, even if that were right, the question is what inferences can be drawn from that, I think is a fair reading of this Court's precedent, Supreme Court precedent. What inferences can fairly be drawn from that? So the inferences that Mr. Ricks would like the Court to draw are that the reasons were essentially a pretext for costs. I mean, there's no allegation that there's a departure from the policy itself. We've heard my friend on the other side describe the problem with the policy is that it does not clearly mandate treatment. If you hit X threshold, he takes issue with the fact that it. But you don't deny that Easter and Green do stand for the proposition that delay alone can amount to deliberate indifference, correct? I heard, I think I heard Green was the second case, but then understanding Easter and Green stay for the proposition, if the question is delay, I think the way De Lauder phrased it was there's got to be an allegation that the inmate, there's no subjectively knows an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to evade it. Reasonableness. Now, in this period, his own. In this period, what measure was taken that was actually curative instead of just watch? What does, what's there that say they did anything curative? So Mr. Ricks alleges that there was no curative treatment in this period because that's his allegation. I'm not going to waste my time fighting against it. That is his allegation. But his own sources about this narrow period of time acknowledge, starting at page, I believe it's 105 to 106 of the record, that there was this world of universal treatment that Mr. Ricks would like the court to look at today as we stand here was not the world between 2016, 2019. Let me give you an example. Even right now, as a state employee, right, at least a year ago, my insurance, heaven forbid I had hepatitis C, all of a sudden I tried to get a doctor's note, right? They might say, well, standard of care is get treatment. They wouldn't cover it unless I met certain thresholds. But they've got to do something. It is a fatal, irreversible disease, and in that period the scarring is becoming undeniable. Or would you say no? So I would say, I think I originally might have had a similar impression, but then I kind of came to realize something from Lawson, which is the way that Lawson, Roy v. Lawson, discusses chronic conditions. And I think, Your Honor, you are exactly right to distinguish acute versus chronic conditions during the opening phase of the argument today. On a chronic situation where you've got these complex, evolving issues that are different from patient by patient, what you've got to allege is something like the condition required, the quote was, we don't have either of those allegations here. It's not an acute pain case. It's not. But most chronic diseases aren't. So in that situation, we do have the fact that he's asking for it year after year after year, the patient is. And the missing link is he's also seeing doctors, but the allegation is that she's the one preventing the treatment. And we just, right, at the motion to dismiss stage, the huge mystery for me is, were doctors supervising his medical care? Or was she the one doing all the interpreting and just saying, no, no, no, we're going to watch, we're going to watch. And then 2018, numbers are too high. You can't get it. So Mr. Riggs is not disputing that he was consistent with the policy referred to medical providers. He's getting the diagnostic testing. We have case after case from this court describing that monitoring and evaluation is part of managing this chronic condition. Hepatitis C really is unique. I mean, there are a few conditions quite like it where it varies person to person. And recall also that in this period in 2016 to 2019, you did have patients, and his own literature talks about this around pages, I believe it's 125 and 108 to 112, that you had patients who had been hepatitis C positive for some time. And there's sort of a buildup of patients. And now they're getting them. And it does progress differently from person to person. And even if your Honor's description of what Mr. Riggs is alleging is the most favorable possible inference we could draw from the complaint, he still walks headlong into the qualified immunity problem. But Easter let that go to summary judgment. Van Wagner let it go to summary judgment. Well, the interesting thing, I think, about summary judgment is the more summary judgments we have that say, no, if this is all you can show after discovery, you don't get there. You don't get there. We can use that going forward. It provides some guidance about. But you want this case to be the pivot case. Do you have a best circuit level decision doing it at this stage? Well, I mean, I would look at, you know, I acknowledge Roy v. Lawson was a summary judgment case. But recall also that Hendricks was a 1915 dismissal favorable, hepatitis C. And it was, I believe, that particular prong of 1915 dismissal was because it was frivolous. And there was, I believe, Hale v. Raspberry was another case that was that dismissal stage. So these cases do exist. And it's all about what is the, you know, what's the inference that can be, you know, that can be drawn from them. My friend on the other side relies heavily on the standard of care point. But, of course, even back to Gobert, 2006 case, this court has explained that the standard of care is totally separate from the question of deliberate indifference. Again, to my example earlier, just because I can get a doctor's prescription for something doesn't mean that I can necessarily demand that a particular therapy materialize at the drop of a hat. He puts particular emphasis on the Eleventh Circuit in Mitchell. Do you want to speak to that? Sure, Your Honor. I pulled this out while my friend on the other side was speaking. I couldn't help but notice that Mitchell, for example, is another example of one of these 1915 instances about a prisoner pro se complaint. This is not an issue of qualified immunity, for one. I would point that out. And there was, I believe, you know, an allegation that it had been frivolous. And we do see in the briefing that my friend on the other side relies heavily on some of these 1915 prisoner pro se cases where the court makes the simple point that at the screening stage, but not a 12B6 dismissal, but at the screening stage, to see if it's frivolous or if they can overcome the three strikes bar, the court will say, well, you've alleged these things about access to hepatitis C drug therapy, for example, and you've stated enough to get over the three strikes bar, for example. I have yet to find a case in the briefing in that 1915 context that looks at whether the defendants were entitled to qualified immunity, for example. And it does not involve the line of analysis about the plausible inferences that can be drawn from the alleged conduct by defendants. It's just a different threshold. I would point to the Hoffer case that came out to that, but also the 20AJ response that I filed cited a very recent Fourth Circuit opinion by Judge Wynn and explained that at least on the qualified immunity front, even assuming that there was some actionable constitutional claim about access to new DAA drug therapy, the law is so unsettled, there's no clearly established law that would put anyone on notice that exactly the type of policy, monitoring, evaluation, treatment, exactly this type of thing that is alleged to have happened here was unconstitutional. And so I would respectfully submit that ruling for Mr. Ricks here would create a very problematic circuit split, and I'd respectfully ask the court to avoid doing that. Well, going back to the policy, he's saying the policy should, because of these universal standards, say you must treat at some point, whatever some objective point is. What about that? And that the doctors here, in this case a physician's assistant, said, well, I don't think you're sick enough and now you're too sick, but you never got treated at any point. So the way I would handle that question is I would want to look at what Mr. Ricks actually said, so I would want to look at his most recent description of his own claims in district court. He filed a more definite statement and then a letter of concern. This is at ROA 141 where he says what he's complaining about is the delay and failure to prioritize him for treatment. Now, if what he means by that is the specific people that evaluated me and used medical judgment didn't arrive at the right conclusion, that is a textbook case of medical negligence, or at least nothing more than medical negligence. And the case law on that I think is crystal clear, that if all you're complaining about is that you were put in the wrong bucket of people, so to speak, for lack of a better term, about when to get your treatment, that is a complaint about the exercise of medical judgment. I believe that because of the ‑‑ Well, let's assume the allegations. There are two articles out there that he says are, quote, the universal standard, and they say you must do X. And neither the policy nor the people who were monitoring and treating him did X. So if that's true, where are we? So where we are is the allegations of his complaint and everything incorporated by reference in it. So it will not work for Mr. Ricks to read snippets of a couple of articles without taking in the full context. And the context that's important there is the articles I believe Your Honor is referring to, the one from Mr. Flam in 2017. Again, this is about a year after he says you should have started getting it. Even in 2017, these articles are saying it's really not feasible yet, right? There are still barriers to actually doing this treat everybody theory. So ‑‑ What are those barriers? Well, there are a couple of them discussed at ROA 108. This is the March 2019 AASLD guidance about when and in whom to initiate HCV therapy. The infrastructure was not in place before about 2019 when that article came out. That's a March 2019 article. The infrastructure wasn't in place before 2019. There's the lack of trained staff. Is this in prisons or in the medical community in general? This is in prisons. This is talking about in prisons. And you could look at ROA 106, for example. That's the prison's problem. Yeah. I mean, is that your defense is that it might have been the standard of care outside the prison, but our standard of care is a notch or two below that, and so he's just out of luck? No, Your Honor. I didn't mean to imply that. I'm simply referring to the standards that Mr. Ricks is relying on in advancing his claim, and they talk about this narrow window of time. This is a backward-looking period where prisons are trying to figure out how to deploy these brand new drugs. I believe at ROA 158 we can look at the prison policy from the BOP. Even the federal BOP didn't even have DAAs available until October 2016. So this is this backward-looking period. Because, remember, Mr. Ricks received the drug therapy with DAA medications early, at least spring 2019, and so this is only a backwards-looking claim for damages where he has to over- The American Association for the Study of Liberty Diseases and the Infectious Disease Society of America. Those are not prison things. No, they're not. He alleges that they are the universal standard and that under that universal standard he should have been treated. So I acknowledge that that's what he alleges, but even if the court believed that stated a constitutional claim, he'd still run headlong into qualified immunity because no case would have put prison medical officials on notice that in that narrow window between 2016 and 2019 that exactly what occurred with alleged prioritization was constitutionally inappropriate. To the contrary, we have cases that would have told them, for example, that in Gobert would have put them on notice that the standard of care is a separate question from what's constitutionally required. I believe Hoffer, for example, from the 11th Circuit, talks about this general point that in the prison medical setting, we do see things like resource constraints, staff availability. I mean there are a number of complex considerations that go on into managing these types of conditions for thousands of people. It doesn't meet the medical standard of care. You can't just say we're a prison and say we don't have to. You sound as if you're saying that the standard of care in New Orleans among doctors who treat this particular kind of thing is X. But in the prison system, you've got to cut that back about three years, and so you don't get to X at the same time that you would in the New Orleans metropolitan area. I don't understand. That's not what you're saying? That's not what I'm saying, and that's not what Mr. I don't believe that's even what Mr. Ricks is alleging. What he's saying is that he was delayed in his treatment due to cost restrictions, but we've known for decades the Foti cases, Woodall v. Foti, Mayweather v. Foti, Lawson talks about this. We really cannot talk about deploying medical care at that constitutional level. It's not a wanton disregard that states a claim of deliberate indifference, and even if things like costs are factoring into it, that is not a level of deliberate indifference that states claim. You're not answering the question with all due respect. If this medical standard of care is universally agreed out, period, by competent physicians, that at some objective medical test you must get DEAA treatment, how in the world can prisons say, well, we just can't afford that or we couldn't afford it until two more years? So, Your Honor, again, I'm taking his allegations as the most favorable way that I can. I understand he alleges that the universal standard of care is in his characterization to provide DEAA medications, but we know from the policy he incorporates by reference. I see my time has expired. May I finish? Yes, please. It's not universal in the sense that it strips the medical evaluation provider's job under HCV policy. One of the things is you've got to make sure there are no contraindications. You've got to make sure that the person is not suffering from other conditions that make treatment inappropriate. For example, somebody might have untreated cancer that would show up on a scan, lesions. You'd have to do additional scans. Those are the types of reasons I can't just agree that there is this universal standard of care. All you have to do is show an article, ignore the parts of the article that say, this is really not feasible to do at this time, and get past it. How soon after he sued did he start getting DEAA? I believe it was within two months or so, a short period of time. I keep thinking I'm hearing you saying that the fact that it may be the standard of care here in New Orleans or Louisiana that you start the treatment when the test results show X, but in the prison system you're not governed by that. Is that what you're saying? You say in the prison system we have our own criteria for when you start treatment, and the fact that in the generally accepted medical community it's a much sooner place where you start treatment. In the prison system we get plus three years or whatever. Is that what you're saying? I don't mean to be critical of you or your message, but I'm not sure I understand what your message is. My message on standard of care, Gobert tells us that standard of care is a different inquiry than what the level of deliberate indifference would be. It's a different question. So it's hard for me to answer that because I've read this court's precedent as saying they are different inquiries. That's true. That is true. But her question and my question is, is the standard of care different? I mean, that's a starting point. You have to know what the standard of care is to decide if a prison official was indifferent to the medical needs of a prisoner based on standard of care. So is the standard of care different in a prison context than the private sector? Just the standard of care. With the sense that the standard of care for someone with a hepatitis C is an individualized determination based on medical judgment about the person in front of them, with that caveat, I guess I'm not disputing. I don't think we have a point of departure on the standard of care question. I think the way Mr. Ricks describes the standard of care and how to look at it is overly broad, I guess is what I'm saying. But you're not. So how do you answer our question? You're not saying that the standard of care in the prison system is different than the one here. I mean, if you went to a doctor of reasonable competence in New Orleans, they would say with these blood test results, you've got to start care right now. You're saying that it is possible in the prison system that the prison doctors would say, no, we're going to let this coast for a while and we'll see, and maybe two or three years from now we start care. Is that what I'm hearing? I doubt it. The standard of care at the relevant time, that 2016 to 2019 winter, the standard of care involved this level of the prioritization that Mr. Ricks is talking about. His own literature talks about evaluation and then a prioritization based on medical decisions. You're saying that a physician in a prison context would be consciously indifferent if they didn't apply the correct standard of care. We're not saying that. We're just asking you to say one way or the other, is the medical standard of care different for a prison doctor, just what the medical standard is versus a doctor at Ochsner. Not whether they're deliberately indifferent, not whether they're negligent, just which is the standard of care that doctors on the outside world would apply. Can a prison official say, no, that's not my standard of care? We're not saying that they're applying a different medical standard of care. That's a starting point. What is the medical standard of care? Right. Is it the same? Right. If it's the same, I think I understand Your Honor's question, if it's the same, where do you go from there? What inferences do you draw? Is it the same? Is it the same? With the way Your Honor phrased it, we're not saying that it's different in that respect. But what is the period of time for that standard of care? He's using today as we stand here versus 2016 to 2019. No, we're not. I don't think we're using that. We're saying on the same day in the same year. Okay. I'm not disputing that. I'm not disputing that. But even putting aside if that were to state a constitutional claim, there's no clearly established law that would put them on notice that the inferences that my friend on the other side wants to draw from alleged discrepancies in actual care received, there's no clearly established law that puts them on notice that the period of monitoring, for example, evaluation constant, labs, ultrasounds, things like that, is so constitutionally inadequate that it could constitute deliberate indifference. So even if there were a violation, it cannot overcome qualified immunity. It has to be decided at the motion to dismiss stage. I hear you. Unless there are any further questions, I'll ask the Court to affirm. Thank you. Your Honor, two quick points. I first want to touch on the chronic acute point, and then I'll return to the policy point that was just being discussed. As my friend did say, and Roy does make the point that when there's an immediate need, there needs to be an immediate need for medical care. And with respect, I think that is present here with cirrhosis. I think the Eleventh Circuit in Smith v. Ward gave a great example of this. In the Eleventh Circuit, if you allege that you are being denied DAAs and have cirrhosis, that establishes that monitoring cannot avoid imminent danger to serious injury, because that is true. When you have cirrhosis, you are at risk for a serious injury. That is key, and that makes the chronic acute point really kind of collapses here. Here's my problem. I want to hear doctors say that, not a judge. And where is it in this record that every doctor says if you've got cirrhosis, you must get DAA treatment? Absolutely, Your Honor, and that returns to the guidelines. The baseline for the guidelines by the relevant medical authorities is that anyone suffering from hepatitis C should be given DAAs regardless of liver scarring. Now, an older version of the guidelines from 2015 recognized where resources are tight, you can't treat everyone immediately. Okay, if that's true, there's a prioritization table, and the prioritization table lists at the very top, Tier 1, those suffering from cirrhosis or severe fibrosis. Those people need immediate treatment even when resources are tight or limited. And here, Your Honors, Ricks has been severe fibrosis since 2013, has had cirrhosis since 2016, yet he did not receive DAA treatment until April of 2019, two and a half years later. That is not prioritization by any regard, and it is a conscious disregard for the irreversible scarring that Ricks was suffering that will cause him complications for the rest of his life. And indeed, since this appeal has been pending, he has had four surgeries because of his dysfunctioning liver that the defendants allowed to get to that point. That is a conscious disregard of Ricks' health. And, you know, I just want to point, as alleged, some pertinent points in the record. At page 29 of the record, the unit provider of Mr. Ricks even stated she didn't know why he was not being referred for treatment. Why was he not at the top of the list? Because it doesn't make sense based on the lab results that he was having. And Mr. Ricks also alleged, returning to Ms. Pickthall, that she would rattle off the lab results, this is at page 34 of the record, with total disregard for the consequences of Ricks' liver going cirrhotic. It's an allegation that she looked at the cirrhosis, totally disregarded it, and said it's not important, you just need to go on about your way. That, at this stage, is a plausible deliberate indifference claim. Now, we are not saying, on summary judgment, that defendants are free to come forward and say, maybe this was a mistake, maybe they just read these results differently,  but, Your Honors, the allegations, as reasonably interpreted to Ricks, have given him the right to figure out, in discovery, why treatment was denied for him for two and a half years. So, I guess, would it be fair to say you're saying this is not like cancer, this is not a complexity, where when you initiate chemo, it's actually a really hard decision, because it's got side effects and all that. This is maybe more like HIV, where you've got to get a specific type of treatment early. Your Honor, Is that essentially what's happening? Yes, Your Honor. And in that sense, it's more like they see someone with blurred vision or paralysis, and that's a stroke. And the same signs in the prison would be the same ones outside the prison. Your Honor, here, again, hepatitis C is very unique in that the baseline standard of care that everyone recommends is that you need to get DEA treatment as soon as you are diagnosed as chronic hepatitis. That's like HIV, correct? Correct. You have any clearly established law cases where a prison not facilitating, I think that's really what's alleged here, is they were monitoring it, and it appears they're sending him for all sorts of medical care. Would you say where's the impediment to a doctor saying, okay, you're not going to have side effects, and we've got to give this? Can you repeat the question, Your Honor? Well, I guess the question is, is the allegation one that they're impeding medical professionals from giving it? I guess it is. The allegation is, again, Ms. Pickthall is a medical professional. She's a physician's assistant. Which is a medical professional. Does she have authority to administer the DAA herself? The medical board says in the grievance response that she is the one that's supposed to prioritize him for treatment. And in district court cases that were cited by the defendant, it is clear that she plays at least some role in the process. She can recommend treatment at least. Can I ask one question? Yes, absolutely. He pointed to some dismissal cases, Hendricks and Hale v. Raspberry. Are you familiar with those two cases? I'm familiar with Hendricks, Your Honor. I believe the other one, the Hale v. Raspberry, and I may be wrong on this, but I believe that was pre-DAAs, before DAAs were even around. But Hendricks, again, does not involve here any allegations of the serious liver damage that was being suffered. And that's the distinguishing point. And with that, Your Honor, we ask that this court reverse and remand. And thank you for your time. The court appointed you. You've done an excellent job for your client. And we appreciate your taking the case. Thank you, Your Honor. I appreciate it.